# Exhibit D

# Westlaw.

1997 WL 33547093 (C.A.9)    Page 1
**(Cite as: 1997 WL 33547093)**

For Opinion See 161 F.3d 545

United States Court of Appeals,Ninth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Gabriel SANCHEZ-LIMA, Defendant-Appellant.
No. 97-50146.
December 11, 1997.

Appeal from the United States District Court for the Southern District of California, D.C. No. 96cr1045-EJS

Brief for Appellee United States
Alan D. Bersin, United States Attorney, Bruce R. Castetter, Assistant U.S. Attorney, Chief, Appellate Unit, Chief, Criminal Division, Jacqueline J. Jackson, Assistant U.S. Attorney, 880 Front Street, Room 6293, San Diego, California 92101-8893, Telephone: (619) 557-7843, Attorneys for Plaintiff-Appellee, United States of America

**\*i TOPICAL INDEX**

TABLE OF AUTHORITIES ... v

I QUESTIONS PRESENTED ... 1

II STATEMENT OF THE CASE ... 2

A. NATURE OF THE CASE ... 2

 1. Basis for Subject Matter Jurisdiction in the District Court ... 2

 2. Basis for Jurisdiction in the Court of Appeals ... 2

 3. The Judgment of Conviction Is Appealable ... 2

 4. The Notice of Appeal Was Timely ... 3

 5. Bail Status ... 3

B. PROCEEDINGS AND DISPOSITION IN THE DISTRICT COURT ... 3

C. STATEMENT OF FACTS ... 4

 1. Sanchez-Lima's Assault on Border Patrol Agents Salzano and Kermes ... 4

 2. Pretrial Proceedings ... 8

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

3. The Trial ... 11

III SUMMARY OF ARGUMENT ... 12

IV ARGUMENT ... 14

A. THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY ... 14

1. Introduction ... 14

2. Standard of Review ... 15

3. Sanchez-Lima Was Not Entitled To a Self-Defense Instruction ... 15

*ii   4. The Court Properly Instructed the Jury that the Government "Always" Has the Burden of Proving Defendant Guilty Beyond a Reasonable Doubt and that Sanchez-Lima Had No Burden ... 17

B. THE TRIAL COURT PROPERLY RULED THAT THE INDICTMENT SHOULD NOT BE DISMISSED DUE TO THE RELEASE OF MATERIAL WITNESSES ... 19

1. Introduction ... 19

2. Standard of Review ... 20

3. The Government Acted in Good Faith ... 20

C. THE DISTRICT COURT DID NOT ERR IN DENYING THE MOTION FOR DEPOSITIONS OF THE MATERIAL WITNESSES ... 23

1. Introduction ... 23

2. Standard of Review ... 23

3. Sanchez-Lima's Request to Conduct Depositions Was Untimely ... 24

4. The Proposed Deponents Do Not Possess Relevant, Non-Cumulative Information ... 25

D. THE DISTRICT COURT PROPERLY REFUSED TO ISSUE RULE 17(b) SUBPOENAS ... 26

1. Introduction ... 27

2. Standard of Review ... 28

3. The District Court Does Not Have Authority to Enforce Subpoenas Beyond Its Jurisdiction ... 28

4. The District Court's Ruling Did Not Prevent Sanchez-Lima from Presenting a Defense ... 29

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

Note: Table of Contents pages iii-iv missing in original document

*v *TABLE OF AUTHORITIES*

*Cases*

*Smith v. Pepsico, Inc.*, 434 F. Supp. 524 (D.C. Fla. 1977) ... 42

*Tinsley v. Borg*, 895 F.2d 520 (9th Cir. 1990) ... 34

*United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989) ... 15

*United States v. Armenta*, 69 F.3d 304 (9th Cir. 1995) ... 20

*United States v. Bosch*, 951 F.2d 1546 (9th Cir. 1991) ... 41-43

*United States v. Croft*, No. 95-30387 (9th Cir. Sept. 5, 1997) ... 38

*United States v. Cuevas*, 847 F.2d 1417 (9th Cir. 1988) ... 24

*United States v. Dring*, 930 F.2d 687 (9th Cir. 1991) ... 20, 21, 22, 43, 44

*United States v. Drogoul*, 1 F.3d 1546 (11th Cir. 1993) ... 28

*United States v. Duran*, 41 F.3d 540 (9th Cir. 1994) ... 34-42

*United States v. Farfan-Carreon*, 935 F.2d 678 (5th Cir. 1991) ... 28

*United States v. Fowlie*, 24 F.3d 1059 (9th Cir. 1993) ... 30

*United States v. Hayes*, 794 F.2d 1348 (9th Cir. 1986) ... 18, 19

*United States v. Hegwood*, 977 F.2d 492 (9th Cir. 1992) ... 38

*United States v. Henderson*, 68 F.3d 323 (9th Cir. 1995) ... 37

*vi *United States v. Hernandez*, 109 F.3d 1450 (9th Cir. 1996) ... 40

*United States v. Hernandez-Escarseca*, 886 F.2d 1560 (9th Cir. 1989) ... 23-24

*United States v. Hohman*, 825 F.2d 1363 (9th Cir. 1987) ... 26

*United States v. Hollister*, 746 F.2d 420 (8th Cir. 1984) ... 42

*United States v. Keiser*, 57 F.3d 847 (9th Cir. 1995) ... 14-15

*United States v. Mason*, 902 F.2d 1434 (9th Cir. 1990) ... 14

*United States v. Meling*, 47 F.3d 1546 (9th Cir. 1995) ... 38

*United States v. Morton*, 999 F.2d 435 (9th Cir. 1993) ... 16-17, 26

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)                                          Page 4
**(Cite as: 1997 WL 33547093)**

*United States v. Reese*, 2 F.3d 870 (9th Cir. 1993) ... 15

*United States v. Rhodes*, 713 F.2d 463 (9th Cir. 1983) ... 31

*United States v. Richardson*, 588 F.2d 1235 (9th Cir. 1978) ... 24-25

*United States v. Rivera*, 43 F.3d 1291 (9th Cir. 1995) ... 38

*United States v. Santiago*, 46 F.3d 885 (9th Cir. 1995) ... 38

*United States v. Shaw*, 812 F.2d 1182 (9th Cir. 1987) ... 32

*United States v. Sibla*, 624 F.2d 864 (9th Cir. 1980) ... 40

*United States v. Sims*, 637 F.2d 635 (9th Cir. 1980) ... 28

**\*vii** *United States v. Sindona*, 636 F.2d 792 (2d Cir. 1980) ... 28

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982) ... 22-23

*United States v. Von Willie*, 59 F.3d 922 (9th Cir. 1995) ... 37

*United States v. Wagner*, 834 F.2d 1474 (9th Cir. 1987) ... 32

*United States v. Woodley*, 9 F.3d 774 (9th Cir. 1993) ... 15

*Constitution*

Sixth Amendment ... 34

*Statutes*

8 U.S.C. § 1325 ... 30

18 U.S.C. § 111 ... 2, 3, 18, 26

18 U.S.C. § 3231 ... 2

28 U.S.C. § 144 ... 40-41

28 U.S.C. § 455 ... 41

28 U.S.C. § 1291 ... 2

28 U.S.C. § 1783 ... 28

**\*viii** *Rules*

Fed. R. Crim. App. 4(b) ... 3

Fed. R. Crim. P. 15 ... 24

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)


Fed. R. Crim. P. 15(a) ... 23

Fed. R. Crim. P. 17(b) ... 1, 10, 27-29

Fed. R. Evid. 804(b) ... 33

Fed. R. Evid. 804(b)(5) ... 30

**\*1 I**

## QUESTIONS PRESENTED

1. Whether the district court erred in failing to instruct the jury that the Government was required to disprove self defense.

2. Whether the trial court erred in refusing to dismiss the Indictment due to the Government's release of material witnesses.

3. Whether the district court erred in denying the motion for depositions of the material witnesses.

4. Whether the district court erred in refusing to issue Rule 17(b) subpoenas.

5. Whether the sworn videotaped statements of the witnesses in Mexico should have been admitted into evidence.

6. Whether the admission of Agent Loven's opinion that Agent Kermes was telling the truth constitutes reversible error.

7. Whether Judge Schwartz erred in denying the motion for a new trial because Judge Brewster should have recused himself.

**\*2 II**

## STATEMENT OF THE CASE

### A. NATURE OF THE CASE

#### 1. Basis for Subject Matter Jurisdiction in the District Court

Appellant Gabriel Sanchez-Lima [hereinafter "Sanchez-Lima"] appeals from a judgment imposed by the Honorable Edward J. Schwartz, United States District Judge for the Southern District of California, after Sanchez-Lima was convicted by a jury of assault on a federal officer, in violation of 18 U.S.C..§ 111. [RT 534; ER 394.][FN1] The offense took place in the Southern District of California and, therefore, the district 'court had jurisdiction pursuant to 18 U.S.C. § 3231.

  FN1. "RT" refers to the Reporter's Transcript of the trial.
  "RT" refers to Appellant Sanchez-Lima's Excerpts of the Record.


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

Page 6

### 2. *Basis for Jurisdiction in the Court of Appeals*

This Court has jurisdiction over appeals from final judgments of the district courts pursuant to 28 U.S.C. § 1291.

### 3. *The Conviction Is Appealable*

A judgment of conviction in a federal criminal case is a final Porder subject to appeal under 28 U.S.C. § 1291.

### *3  4. *The Notice of Appeal Was Timely*

Under Rule 4(b) of the Federal Rules of Appellate Procedure, the Notice of Appeal in a criminal case must be filed within ten days of the entry of the judgment. The Judgment and Commitment relating to Sanchez-Lima was entered on February 24, 1997. Sanchez-Lima filed Notice of Appeal within the ten-day limit on March 4, 1997. [ER 457.]

### 5. *Bail Status*

Sanchez-Lima is presently in custody serving his 79-month sentence.

### B. *PROCEEDINGS AND DISPOSITION IN THE DISTRICT COURT*

On August 28, 1996, a federal grand jury for the Southern District of California returned a two-count Indictment. Count 1 charged Sanchez-Lima with assaulting United States Border Patrol Agent Mark Salzano with a deadly and dangerous weapon, to wit: a rock, thereby inflicting bodily injury on him, in violation of 18 U.S.C. § 111. Count 2 charged Sanchez-Lima, with assaulting United States Border Patrol Agent David Kermes, in violation of 18 U.S.C. § 111. [ER 1-2.]

On July 15, 1996, Judge Rudi M. Brewster denied Defendant's Motion to Dismiss the Indictment due to the release of material witnesses. [ER 25.] On September 30, 1996, the district court denied Defendant's Motion for Reconsideration and Motion to Depose foreign witnesses located in Mexico. [ER 127.] Defendant's Motion in Limine to permit videotaped sworn testimony under the residual *4 hearsay rule was denied on October 15, 1996. [ER 172.] Additionally, on that date, the district court denied a Motion to Subpoena *ad testificandum* foreign nationals located outside the United States. [ER 169.] On October 16, 1996, a four-day trial commenced before Judge Edward J. Schwartz. On October 21, 1996, the jury found Sanchez-Lima guilty on Count 1 and deadlocked on Count 2 of the Indictment. [ER 394, 397.]

On November 18, 1996, the district court denied Defendant's Motion for a New Trial. On February 24, 1997, the judge sentenced Sanchez-Lima to 79 months in custody.

### C. *STATEMENT OF FACTS*

### 1. *Sanchez-Lima's Assault on Border Patrol Agents Salzano and Kermes*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)                                                        Page 7

Sanchez-Lima illegally entered the United States on May 22, 1996, traveling with
approximately 24 other aliens, via Otay Mountain, a remote, rugged area along the
United States/Mexico border in San Diego County, California.

At the time of illegal entry, Border Patrol Agent Christopher Bush was operating
an infrared telescope on Otay Mountain. [RT 291, 295; SER 167.] [FN2] At approxim-
ately 1:30 a.m., Agent Bush observed through the telescope a large group of sus-
pected undocumented aliens traveling north into the United States. [RT 294; SER
166.]

    FN2. "SER" refers to Appellee United States' Supplemental Excerpts of the
    Record.

*5 Agent Bush informed Agent Salzano of the aliens. Agent Salzano responded to the
group with Agents Kermes and Carlos Martinez. [RT 295; SER 167.] Using the in-
frared scope, Agent Bush directed Agents Salzano, Kermes, and Martinez through the
rugged, mountainous terrain to the location of the aliens. [RT 301; SER 87.]

When the agents arrived in the area, some of the aliens called out "La Migra,"
which is Spanish slang for Border Patrol. The group then began to run. [RT 142;
SER 137.] The three agents encircled the group and took the aliens into custody.
[RT 143; SER 138.]

Agent Kermes approached an alien, later identified as Sanchez-Lima, and identified
himself as a Border Patrol Agent. [RT 218; SER 154.] Sanchez-Lima begged Agent
Kermes not to take him into custody, stating, among other things, "Let me go . . .
. My family has money." [RT 218-219; SER 154-155.] Agent Kermes attempted to take
Sanchez-Lima into custody, but Sanchez-Lima pushed Agent Kermes away and ran into
the brush. [RT 219; SER 155.] Agent Kermes initially pursued Sanchez-Lima, but de-
cided to first apprehend other aliens in the area. [RT 221-222; SER 157-158.]

The agents ultimately took 22 of the aliens into custody, and consolidated this
group in one location. [RT 147, 302; SER 142, 88.] Agent Kermes then told Agent
Salzano about his encounter with Sanchez-Lima. [RT 148; SER 143.]

After a group of 22 aliens was in custody, Agent Bush switched the infrared scope
to a higher magnification to look for the *6 remaining aliens. [RT 302-303; SER
88-89.] Agent Bush spotted three aliens fleeing the area. [RT 304; SER 90.]

Agent Bush advised Agent Salzano of his observation, and directed Agent Salzano to
the three aliens. [RT 148-149; SER 143-144.] When he got so close that he could
hear one of the aliens moving through the brush, Agent Salzano stopped to await
further directions from Agent Bush. [RT 149-50; SER 144-145.]

Agent Salzano waited for approximately five seconds in a squatting position, but
did not hear from Agent Bush. [RT 150-151; SER 145-146.] Agent Salzano decided to
call Agent Bush on his radio for further instructions. [RT 150; SER 145.] When

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

Agent Salzano reached for his radio, he saw Sanchez-Lima with his arm raised above his head and a rock in his hand. [RT 150-151; SER 145-146.] Sanchez-Lima smashed the rock against the left side of Agent Salzano's face. [RT 151; SER 146.] The blow landed directly above Agent Salzano's Border Patrol patch and badge, which were affixed to the left side of Agent Salzano's jacket. [RT 152; SER 147.] Agent Salzano fell to the ground [RT 152; SER 147], where he remained for 2 1/2 hours, until a helicopter took him off the mountain. [RT 195; SER 153.]

After smashing the rock against Agent Salzano's head, Sanchez-Lima fled in the direction of Agent Kermes, who had remained in the area of the 22 aliens in custody. [RT 307, 229-230; SER 93, 159-160.] Agent Kermes--who was not then aware that Agent Salzano had **7 just been assaulted [RT 235; SER 165]--heard Sanchez-Lima moving quickly toward him through the brush. [RT 229; SER 159.]

Agent Kermes identified himself as a Border Patrol Agent, and instructed Sanchez-Lima to stop. [RT 229; SER 159.] Sanchez-Lima disregarded Agent Kermes' command, and continued to charge toward Agent Kermes. [RT 230; SER 160.] Agent Kermes observed that Sanchez-Lima appeared "scared," "was breathing hard" and "was very excited." [RT 231; SER 161.] Agent Kermes also recognized Sanchez-Lima from their earlier encounter, when Sanchez-Lima resisted Agent Kermes' attempts to place him under arrest. [RT 231; SER 161.]

Because Sanchez-Lima disobeyed Agent Kermes command to "stop" and continued charging toward Agent Kermes, Agent Kermes drew his weapon. [RT 231; SER 161.] Sanchez-Lima then grabbed Agent Kermes1 pistol with both hands. [RT 232; SER 162.] Agent Kermes broke Sanchez-Lima's hold on the pistol, but Sanchez-Lima continued grabbing for Agent Kermes1 gun. Agent Kermes responded by striking Sanchez-Lima twice on top of his head with the pistol. Sanchez-Lima finally submitted and was taken into custody. [RT 232; SER 162.]

Agent Kermes then noticed that Agent Salzano was missing, and called out to him. [RT 234; SER 164.] Agent Salzano responded that he was hit. [RT 234; SER 164.] Agent Kermes followed the direction of Agent Salzano's voice and found Agent Salzano lying in a pool of his own blood. [RT 234-235; SER 164-165.]

**8 Agent Salzano suffered severe and permanent injuries as a result of Sanchez-Lima's assault. The bone above Agent Salzano's left eyebrow was shattered, his cheek bone, sinus bones and the bottom of his eye socket were "disintegrated." Additionally, Agent Salzano suffered a torn retina in his left eye and has lost all feeling on the left side of his face. [RT 158-159; SER 151-152.]

### 2. *Pretrial Proceedings*

After the assault, both Border Patrol and Federal Bureau of Investigation (FBI) interviewed each of the illegal aliens traveling in Sanchez-Lima's group. [SER 8-67.] None of the aliens claimed to have witnessed an assault. [*Id.*] Some of the aliens claimed to overhear Sanchez-Lima shouting words such as "don't hit me,"

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)                                                    Page 9
(Cite as: 1997 WL 33547093)

see, e.g. id. at 83],-however, there was no dispute that Agent Kermes struck Sanc-
hez-Lima. [RT 232; SER 162.]

The Government concluded that none of these aliens possessed material inculpatory
or exculpatory information justifying their detention as material witnesses. The
Government notified Sanchez-Lima's first Federal Defender (Christopher Tenorio) of
this conclusion by telephone and in a letter on May 28, 1996, and said that the
Government intended to deport the aliens the next day. [SER 7.] The Government
further informed defense counsel of the location of the aliens and their availab-
ility for interview by the defense prior to their deportation. [Id.] Defense coun-
sel immediately dispatched an investigator to interview each of the aliens that
very night. [ER 22-25.] The defense investigator *9 reported the results of the
interviews to defense counsel that next morning. [Id.]

Defense counsel apparently agreed with the Government's assessment that the aliens
possessed no material information, because he made no request to either detain any
of the aliens as material witnesses, or temporarily delay their return to Mexico
to further evaluate the information they possessed. See (Declaration of Assistant
U.S. Attorney (AUSA) Daniel E. Butcher at 1-2). [SER 7, 73-75.] As a result, the
Government granted the aliens' request for a voluntary return to Mexico on May 31,
1996. [Id.]

Believing that a request to detain the aliens was futile, the defense counsel de-
cided to focus his energy on the Motion to Dismiss the Indictment due to loss of
testimonial evidence. [ER 34.] The district court characterized this strategic de-
cision as an unreasonable belief. [ER 73, 75.] In fact, the court questioned the
genuinity of the statement. Lastly, the court determined that if the defense would
have made the request to detain the aliens, it would have been honored. [ER 26-27.]

Unsuccessful in the strategy to have the Indictment dismissed, the defense sought
leave of court to travel to Mexico to depose certain of these aliens. The defense
argued that this evidence was "patently exculpatory" and represented that the ali-
ens were unwilling to travel to the United States to testify at trial. [ER 38-40].
The district court denied this motion on September 6, 1996, and again on September
30, 1996, finding that first, Sanchez-*10 Lima had numerous opportunities to keep
the witnesses here in the United States and failed to do so, [ER 131, 132] and
second, the evidence sought was only minimally helpful.

Disregarding the district court's ruling, a defense entourage, including: (1) Fed-
eral Defender Steven Hubachek; (2) a Federal Defender Investigator; and, (3) a
certified Federal Court interpreter, traveled to Mexico to take videotaped "sworn
statements under oath" at the same time and location as the depositions the court
had denied just four days earlier. [ER 158.] At the conclusion of these sworn
statements, however, the aliens stated--contrary to Sanchez-Lima's previous claim
of unavailability in support of his motions for depositions-- that they were will-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

ing to travel to the United States to testify at Sanchez-Lima's trial. The district court denied Sanchez-Lima's motion to admit these statements at trial, ruling that they were inadmissible hearsay. [ER 172.]

Although only 11 days earlier the defense had financed a three-person trip to Mexico to take obviously inadmissible "sworn statements under oath," Sanchez-Lima's next motion claimed that the defense did not have the funds necessary to transport the aliens to the United States for trial. [ER 167, 169.] Sanchez-Lima, therefore, requested that the district court issue subpoenas pursuant to Fed. R. Crim. P. 17(b), which would have required the Government to pay for the expenses of transporting and housing the aliens during the trial. [ER 167, 169.] The district court denied *11 this motion, ruling that it had no subpoena power over citizens of the Republic of Mexico residing in that country. [ER 172.]

### 3. The Trial

The case proceeded to a jury trial on October 16-18, 1996. In his opening statement, Sanchez-Lima claimed that the evidence would show that he mistook the uniformed Border Patrol Agents for border bandits, and smashed the rock over Agent Salzano's head to save his life and his money. [RT 105-106, 109-111; SER 80-81, 84-86.]

The evidence at trial, however, did not even remotely support this defense. Instead, the evidence revealed that the Border Patrol Agents were wearing uniforms, [RT 133; SER 94], identified themselves to Sanchez-Lima as Border Patrol Agents, [RT 218-19; SER 154-155], and that some of the aliens yelled out to the others that Border Patrol Agents had arrived. [RT 142; SER 137]. The evidence also established that, although the assault took place at night, the background lights from Tijuana illuminated the area, [RT 144; SER 139], and that Agent Salzano's Border Patrol patch and badge were plainly visible to Sanchez-Lima. [RT 156-57; SER 149-150.] Indeed, Sanchez-Lima's own investigator conceded on cross-examination that, given the background lights in the area, a badge would be visible at night. [RT 449-50; SER 171-172.]

As a result, in closing argument, Sanchez-Lima was forced to abandon the "border bandit" defense and offer a new theory of the defense. Sanchez-Lima argued in closing that Agent Kermes had beaten Sanchez-Lima during their initial encounter, and that *12 Sanchez-Lima feared another beating when Agent Salzano approached. [RT 471, 491; SER 175, 183.] Defense counsel argued that Sanchez-Lima therefore was in fear of another beating when Agent Salzano approached, and smashed a rock into Agent Salzano's head to "save his life." [RT 469; SER 173.]

The evidence did not support this version of the facts, however. No witnesses testified that Agent Kermes assaulted Sanchez-Lima during the first encounter. Sanchez-Lima did not even take the stand. Instead, Sanchez-Lima based this theory of the case solely on an allegedly incomplete report written by Agent Kermes, [RT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

478; SER 182], and testimony from some of the aliens that they heard yelling be-
fore the group was taken into custody. [RT 471-75; SER 174-179.]

The jury rejected Sanchez-Lima's inconsistent defenses, and found Sanchez-Lima
guilty of assaulting Agent Salzano. [RT 534; SER 192.] The jury did not reach a
verdict on the charge regarding Sanchez-Lima's separate assault on Agent Kermes.
[Id.].

III

SUMMARY OF ARGUMENT

Sanchez-Lima makes numerous allegations against the district court and the Govern-
ment. First, Sanchez-Lima contends that the district court erred in failing to in-
struct the jury that the Government was required to disprove self defense. Sanc-
hez-Lima was not entitled to a self-defense instruction and the instructions given
adequately addressed the burden of proof issue.

*13 Second, Sanchez-Lima argues that the trial court erred in refusing to dismiss
the Indictment due to the Government's' release of material witnesses. After being
notified of the pending deportation of the illegal aliens, the defense counsel
conducted interviews and made a strategic decision not to request that the aliens
be detained as material witnesses.

Third, the district court erred in denying the motion for depositions of material
witnesses. Because Sanchez-Lima had access to the illegal aliens when they were in
the United States, the district court determined that the circumstance's did not
warrant the extraordinary relief of foreign depositions.

Fourth, the district court erred in refusing to issue Rule 17(b) subpoenas. In
short, the district court does not have jurisdiction over foreign nations in an-
other country.

Fifth, the sworn videotaped statements of the witnesses in Mexico should have been
admitted into evidence. Because the videotapes were unreliable hearsay, the dis-
trict court properly denied the admission of this evidence.

Sixth, the admission of Agent Loven's opinion that Agent Kermes was telling the
truth constitutes reversible error. Agent Kermes testified during the trial and
was subject to cross-examination. As a result, the jury made its own direct as-
sessment of Agent Kermes1 credibility and the admission of Agent Loven's opinion
was irrelevant. All in all, the admission of Agent Loven's testimony constitutes
nothing more than mere harmless error.

*14 Finally, Judge Schwartz erred in denying the Motion for a New Trial because
Judge Brewster should have recused himself. There was not a reasonable basis for
Judge Brewster to recuse himself.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

IV

ARGUMENT

A. *THE DISTRICT COURT PROPERLY INSTRUCTED THE JURY*

1. *Introduction*

Sanchez-Lima contends that the district court erred by not specifically instruct-
ing the jury that the Government bears the burden of proof on the issue of self-
defense and, consequently, Sanchez-Lima should be entitled to a new trial. The re-
cord reveals that Sanchez-Lima was not entitled to a self-defense instruction with
respect to his assault on Agent Salzano. Furthermore, the court adequately in-
structed the jury that the Government had the burden of proving Sanchez-Lima's
guilt beyond a reasonable doubt and that Sanchez-Lima had no burden.

2. *Standard of Review*

In general, "[a] defendant is entitled to have the judge instruct the jury on his
theory of defense, provided that it is supported by law and has some foundation in
the evidence." *United States v. Mason*, 902 F.2d 1434, 1448 (9th Cir. 1990).
"Whether a jury instruction correctly sets forth the elements of a statutory crime
is a question of law reviewed de novo. The district court's formulation of these
elements for the jury is reviewed for abuse of discretion." **\*15***United States v.
Keiser*, 57 F.3d 847, 850 (9th Cir. 1995); *United States v. Reese*, 2 F.3d 870, 883
(9th Cir. 1993). If instructions fairly and adequately cover the elements of an
offense, the court reviews for an abuse of discretion. *United States v. Woodley*, 9
F.3d 774, 780 (9th Cir. 1993) (citation omitted).

3. *Sanchez-Lima Was Not Entitled to a Self-Defense Instruction*

In his ruling on the Motion for a New Trial, Judge Schwartz determined that:
"while there might have some evidence on a possible self-defense by the defendant
as to Agent Kermes on Count 2 of the Indictment as to which there was an inability
of the jury to agree on the verdict and so a mistrial as the second count, there
was essentially no evidence in support of a claim of self-defense as to Agent
Salzano to support any self-defense instruction."

[ER 414.] The judge, therefore, denied the Motion for a New Trial. "A trial court
must instruct on a theory of the case only if the evidence sufficiently supports
the theory and the theory is supported by the law." *See United States v. Aguilar*,
883 F.2d 662, 682 (9th Cir. 1989). Thus, there can be no error in not fully in-
structing the jury on a theory of the defense not supported by the evidence. *Id.*
at 681-83 (finding no error where district court erroneously rejected defense's
proposed definition of a term where there was no evidence to support the instruc-
tion).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

To receive a self-defense instruction, Sanchez-Lima was required to produce evidence of: "(1) a mistake or lack of knowledge as to authority; (2) a reasonable belief that force was necessary to defend against an immediate use of unlawful force; *16 and, (3) the use of no more force than appeared reasonably necessary." *United States v. Morton*, 999 F.2d 435, 437-38 (9th Cir. 1993). Having not taken the stand, Sanchez-Lima presented no evidence on *any* of these elements.

First, Sanchez-Lima produced absolutely no evidence that he was ignorant of Agent Salzano's status as a federal officer. To the contrary, the *only* evidence before the jury was that: (1) Border Patrol has a visible presence at the border; (2) Sanchez-Lima's group had encountered Border Patrol Agents earlier in the evening and fled back into Mexico; (3) Sanchez-Lima's group spotted Agents Salzano, Kermes and Martinez from a distance and attempted to hide in the bushes; (4) the agents orally identified themselves when they approached Sanchez-Lima's group; (5) the aliens in Sanchez-Lima's group yelled out "La Migra" (slang for "Border Patrol") when the agents arrived; (6) Agent Salzano was wearing a uniform with his badge and Border Patrol patch clearly visible; and, (7) Sanchez-Lima picked up a rock and inflicted a precise blow on the left side of Agent Salzano's head while standing on the badge/patch side of Agent Salzano. This evidence was uncontradicted (and, in some cases, offered) by the defense. For his part, Sanchez-Lima produced absolutely no evidence of "an honest mistake of fact or lack of knowledge that the victim was a law enforcement officer" *Morton*, 999 F.2d at 437.

Second, Sanchez-Lima failed to produce any evidence on the other necessary elements of self-defense--that he reasonably *17 believed that force was necessary to defend against an immediate use of unlawful force by Agent Salzano, and that he used no more force than appeared reasonably necessary against Agent Salzano. *Morton*, 999 F.2d at 438. Because Sanchez-Lima did not take the stand, there was absolutely no evidence regarding Sanchez-Lima's subjective belief. The *only* evidence before the jury was that Agent Salzano was. attempting to lawfully arrest Sanchez-Lima, and that Sanchez-Lima responded by blind-siding Agent Salzano and smashing a large rock against his face. There was no evidence that Agent Salzano presented any threat to Sanchez-Lima, or that Sanchez-Lima used no more force than reasonably necessary to protect himself. Sanchez-Lima was required to produce evidence on *all* of the elements to receive a self-defense instruction. Accordingly, because Sanchez-Lima was not entitled to a self-defense instruction with respect to his assault on Agent Salzano, the court could not have erred by somehow inadequately instructing the jury on this issue. The court, therefore, properly denied Sanchez-Lima's request for a new trial.

   4. *The Court Properly Instructed the Jury that the Government "Always" has the*
*Burden of Proving Defendant Guilty Beyond a Reasonable Doubt and that Sanchez-Lima*
*Had No Burden*

Although not entitled to a self-defense instruction, Sanchez-Lima argues that the court did not instruct the jury that the Government must prove the absence of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)                                                                Page 14
**(Cite as: 1997 WL 33547093)**

self-defense beyond a reasonable doubt. Ninth Circuit law is clear, however, that
"[t]he adequacy of the jury instructions . . . is determined by examining **\*18** the
instructions as a whole" and there is no error in refusing a specific instruction
where "the other instructions in their entirety cover that theory." *See United
States v. Hayes*, 794 F.2d 1348, 1351 (9th Cir. 1986).

Here, the court's general instruction on the burden of proof adequately addressed
Sanchez-Lima's proposed reasonable doubt instruction. The court instructed the
jury as follows on the burden of proof with respect to Sanchez-Lima's assault of
Agent Salzano:
The defendant is accused in an indictment with two counts of assault. Count one
charges that on or about May 22, 1996, . . . defendant Gabriel Sanchez-Lima did
willfully and forcibly assault . . . United States Border Patrol Agent Mark
Salzano, while Agent Salzano was engaged in the performance of his official du-
ties; in violation of Title 18, United States Code, Section 111.
. . . .
The indictment is not evidence. The defendant is presumed to be innocent and does
not have to testify or present any evidence to prove his innocence. *The ?? of the
charge beyond a reasonable doubt. It fails to do so, you must return a not guilty
verdict.*

*See* Instruction No. 5 (emphasis added). [SER 168.]

The court further instructed that:
A reasonable doubt is a doubt based upon reason and common sense, and may arise
from a careful and impartial consideration of all the evidence, or from lack of
evidence. Proof beyond a reasonable doubt is proof that leaves you firmly con-
vinced that the defendant is guilty.
*If after a careful and impartial consideration of all the evidence, you are not
convinced beyond a reasonable doubt that the defendant is guilty, it is your duty
to find the defendant not guilty. On the other **\*19** hand, if after a careful and
impartial consideration of all the evidence, you are convinced beyond a reasonable
doubt that the defendant is guilty, it is your duty to find the defendant guilty.*

*See* Instruction No. 6 (emphasis added). [SER 169.]

The court further clarified that "the law never imposes upon a defendant in a
criminal case the burden or duty of calling any witnesses or producing any evid-
ence because *the burden of proving guilt beyond a reasonable doubt is always as-
sumed by the government.*" Instruction No. 8. [SER 170.]

The court instructed the jury in no. less than three instructions that the Govern-
ment bore the burden to prove Sanchez-Lima's guilt beyond a reasonable doubt. The
court also expressly instructed the jury that the defendant bears no burden of
producing any evidence because the burden of proving guilt beyond a reasonable
doubt is *"always"* assumed by the Government. These general instructions more than

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

adequately embraced Sanchez-Lima's requested specific instruction. The court cor-
rectly denied Sanchez-Lima's request for a new trial on this ground. *See Hayes*,
794 F.2d at 1351 (no error in rejecting a specific instruction if, examining the
jury instructions as a whole, the point is covered).

B. *THE TRIAL COURT PROPERLY RULED THAT THE INDICTMENT SHOULD NOT BE DISMISSED DUE*
*TO THE RELEASE OF MATERIAL WITNESSES*

1. *Introduction*

Sanchez-Lima asserts that the trial court erred in refusing to dismiss the Indict-
ment due the Government's release of the **20** undocumented aliens traveling in his
group. The record clearly shows that the Government acted in good faith prior to
deporting the aliens.

2. *Standard of Review*

"Whether an indictment should be dismissed because the government failed to retain
a witness is reviewed de novo." *United States v. Armenta*, 69 F.3d 304, 306 (9th
Cir. 1995) (citation omitted). The lower court's findings of fact with regard to a
motion to dismiss on that ground are reviewed for clear error. *Id.*

3. *The Government Acted in Good Faith*

The court denied the motion to dismiss the Indictment finding that there was no
bad faith on the part of the Government. [ER 28.] The district court also found
that after being notified of the deportation date, Sanchez-Lima interviewed the
aliens but did not request they be detained. [ER 25.] To prevail on this issue,
"the defendant must make an initial showing that the Government acted in bad faith
*and* that this conduct resulted in prejudice to the defendant's case." *United*
*States v. Dring*, 930 F.2d 687, 693 (9th Cir. 1991) (emphasis added). Sanchez-Lima
can make neither showing.

The Government acted in complete good faith in this matter. Each of the aliens
were interviewed at least twice by Government agents (Sanchez-Lima received copies
of these statements as a part of discovery), and approximately nine of the aliens
testified before the Grand Jury.

**21** After conducting the interviews, counsel for the Government notified Sanchez-
Lima's counsel both by telephone and in writing that: (1) the Government had in-
terviewed the aliens; (2) the Government did not believe that any of the aliens
had any significant inculpatory or exculpatory information regarding the assaults;
(3) the Government, therefore, did not intend to detain any of the aliens, as ma-
terial witnesses; and, (4) the aliens were at Barrett Honor Camp if the defense
wished to interview them. [SER 7.] The defense accepted the Government's invita-
tion to interview the aliens, and *made no request that the Government detain any*
*of aliens as material witnesses*. The Government deported the aliens three days

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

later, on May 31, 1996. Indeed, it was not until the filing of the motions by
Sanchez-Lima on July 1, 1996, that the Government received notice that the defense
believed that certain of the aliens possessed material exculpatory information.
Under these facts, Sanchez-Lima cannot carry *his burden* of establishing that the
Government acted in bad faith. *See Dring*, 930 F.2d at 694-95 ("That it is the
criminal defendant who bears the burden of proving that the Government acted in
bad faith" and finding no bad faith where defendant "made no showing that the Gov-
ernment departed from normal deportation procedures [and] made no showing that the
Government deported the aliens to gain an unfair tactical advantage over him at
trial").

Sanchez-Lima also cannot establish that any of the aliens possessed information
material to his defense which he is required **22** to do. *Id.* at 694 ("[defendant]
fails to make a plausible showing that the aliens' testimony would have been ma-
terial to his defense"). To the contrary, in discovery provided to Sanchez-Lima,
all of the aliens stated that they saw nothing related to an assault on a federal
officer. [SER 8-67.]

The only information the aliens possessed potentially relevant to the assault was
the sound of someone screaming. This information, however, was completely irrelev-
ant to the issues in this case as framed by Sanchez-Lima.
Mr. Sanchez' potential defenses may include the following. According to the re-
ports received thus far in discovery, there may important [sic] issues regarding
the actual weapon used for assault, the identification of the person who assaulted
Agent Salzano, and the actual means of assault on Agent Salzano. Additionally,
there may be significant questions regarding the reasonableness and appropriate-
ness of the actions taken by arresting officers in their apprehension and attempts
to subdue Mr. Sanchez. Finally, there will be issues regarding the use and effect-
iveness of identification via the infrared telescope used by Border Patrol.

[SER 2.] The aliens--who only heard screams in the dark--possessed no information
helpful to the defense on these issues. Accordingly, Sanchez-Lima suffered no pre-
judice from their deportation.

Sanchez-Lima cannot establish neither bad faith by the Government nor prejudice to
himself from the deportation of the aliens. The trial court properly denied the
Motion to Dismiss due the release of material witnesses. *See United States v.
Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) ("the responsibility of **23** the Exec-
utive Branch faithfully to execute the immigration policy adopted by Congress jus-
tifies the prompt deportation of illegal-alien witnesses upon the Executive's
good-faith determination that they possess no evidence favorable to the defendant
in a criminal prosecution"). *Id.*

   C. *THE DISTRICT COURT DID NOT ERR IN DENYING THE MOTION FOR DEPOSITIONS OF THE MA-
                                   TERIAL WITNESSES*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

### 1. Introduction

Sanchez-Lima asserts that the district court erred in denying his Motion for Deposition of material witnesses located in Mexico. The district court judge denied Sanchez-Lima's Motion for Depositions on the grounds that the depositions would not have been necessary had the defense simply requested that the witnesses be detained. Having not acted in a normal manner to retain the witnesses, after being put on notice, Sanchez-Lima waived the right to show good cause to go into a foreign country to take depositions. [ER 105.] Moreover, the judge determined that a foreign deposition is extraordinary in defense of criminal case. [ER 127.]

### 2. Standard of Review

This Court reviews the denial of a motion to depose a witness under Rule 15(a) for abuse of discretion. *United States v. Hernandez-Escarseca*, 886 F.2d 1560, 1569 (9th Cir. 1989): "When Rule 15(a) was adopted, "[it] was contemplated that in criminal **24** cases depositions would be used only in exceptional situations." *Id.* at 1570.

### 3. Sanchez-Lima's Request To Conduct Depositions Was Untimely

The court has broad discretion to grant or deny a request for a foreign deposition pursuant to Fed. R. Grim. P. 15. *See United States v. Richardson*, 588 F.2d 1235, 1241 (9th Cir. 1978) ("It is within the sound discretion of the trial court to grant or deny a motion to depose a proposed witness in a criminal trial."). The court may consider the timeliness of the request in denying a motion for a Rule 15 deposition. *See, e.g., United States v. Cuevas*, 847 F.2d 1417, 1429 (9th Cir. 1988) (denying request to take foreign deposition five days before trial; "[i]n light of . . . the government's prompt response to discovery . . . , the trial court did not abuse its discretion in denying [defendant's] late request to take foreign depositions."). The defense was aware of the aliens and their alleged exculpatory information on May 31, 1996, when the Government informed the defense of the location of the aliens and that the Government did not believe that they possessed any material information. The Government also notified the defense that the aliens would be returned to Mexico. After interviewing the aliens, the defense did not request that the Government (1) detain any of the witnesses as material witnesses; or, (2) temporarily delay their return to further evaluate the information obtained from the interviews. Instead on July 1, 1996, **25** Sanchez-Lima filed a Motion to Dismiss the Indictment because of the voluntary return of the aliens. The court denied the motion and set a trial date for September 10, 1996. At that time, Sanchez-Lima did not make a request to depose any of the aliens. Finally, on September 3, 1996, one week before trial and over three months after the defense learned of the aliens return to Mexico, the defense filed a motion requesting leave to travel to the interior of Mexico to conduct depositions.

The defense could provide no legitimate justification for (1) failing to elicit

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)                                                Page 18
(Cite as: 1997 WL 33547093)

testimony from the aliens while they were present in the United States, or at an
absolute minimum; (2) filing the defense motion at an earlier date. Consequently,
the court did not err in denying Sanchez-Lima's request to conduct depositions in
the interior.

    4. *The Proposed Deponents Do Not Possess Relevant, Non-Cumulative Information*

Sanchez-Lima argues that the aliens possessed information to support a defense
that: (1) he did not know the individual he assaulted was a Border Patrol Agent;
and, (2) he acted in self-defense. The aliens, however, could not have provided
any admissible testimony regarding these hypothetical defenses. Regardless, the
vast majority of the proposed testimony is cumulative to undisputed facts pos-
sessed by other witness.

The fact that Sanchez-Lima might have been unaware that the victims of his as-
saults were uniformed federal officers is no **\*26** defense to the crimes alleged in
the Indictment. *See United States v. Hohman*, 825 F.2d 1363, 1365 (9th Cir. 1987)
("Consistent with that purpose, § 111 does not require that the assailant know his
victim is a federal officer . . . . The assailant need intend only to assault one
who later proves to be a federal officer.") *Id.* (Citations omitted.) While such
ignorance is one element of a potential self-defense, this defense is evaluated
"based on the defendant's honest mistake of fact or lack of knowledge . . . ."
*United States v. Morton*, 999 F.2d 435, 437 (9th Cir. 1993). None of the aliens
witnessed the assault and thus would be unable to testify regarding what Sanchez-
Lima perceived or believed in this regard. Such testimony could only come from
Sanchez-Lima.

Additionally, much of the proposed testimony is cumulative to the undisputed
testimony of the other witnesses. The only notable exception is Julio Sanchez-Her-
rera. Sanchez-Lima claims that Julio Sanchez-Herrera would testify that he over-
heard Sanchez-Lima say "Don't hit me," "I don't have any money," "Help me, they
want to kill me," and "put a knife to my throat." Aside from the obvious hearsay
issues presented by this testimony, the purported statements are of very dubious
reliability. Mr. Sanchez-Herrera was interviewed by both the FBI and the Border
Patrol before he was returned to Mexico and did not recall hearing those state-
ments on those occasions. The following excerpt for the FBI's report is the sub-
stance of Sanchez-Herrera's statement:
**\*27** Early Wednesday morning as the group traveled they were spotted by border
patrol. Three border patrol officers made them sit two-by-two and restrained them
with flex cuffs. SANCHEZ HERRERA said everyone in the group complied readily ex-
cept for one group member named GABRIEL SANCHEZ, who was some distance from the
rest of the group. SANCHEZ HERRERA did not see what occurred, but heard GABRIEL
crying because a border official had struck him. Later on, GABRIEL told the group
that the officer had hit him in the head with the butt of his gun, and SANCHEZ
HERRERA noticed GABRIEL was bleeding on the bridge of his nose. GABRIEL said to
SANCHEZ HERRERA he had been afraid. *SANCHEZ HERRERA wasn't sure of GABRIEL'S*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

*story. He felt that the border patrol officials had not mistreated the group in anyway, and he did not see any violence take place.*

[SER 15.] Mr. Sanchez-Herrera informed the Border Patrol that "he heard someone cry out, but did not know if it was in Spanish or English," and "[t]hat he was about.five meters from the voice that cried out, but did not see anything." [*Id.*]

In sum, because the proposed deponents did not witness the assault and can provide no reliable, relevant, non-cumulative, testimony regarding Sanchez-Lima's perception and belief, the district court correctly denied Sanchez-Lima's request to conduct the depositions.

### D. *THE DISTRICT COURT PROPERLY REFUSED TO ISSUE RULE 17(b) SUBPOENAS*

#### 1. *Introduction*

Sanchez-Lima contends because the district court's refusal to issue Rule 17(b) subpoenas ad testificandum for the material witnesses located in Mexico, he was denied the right to present a defense.

#### *28 2. *Standard of Review*

"This court reviews the issuance of a Rule 17(b), Fed. R. Crim. P. Subpoena for abuse of discretion." *United States v. Sims*, 637 F.2d 635 (9th Cir. 1980). The district court's review takes into account considerations of cumulativeness, timeliness, and a satisfactory showing to the district court of relevancy. *Id.* at 629.

#### 3. *The District Court Does Not Have Authority To Enforce Subpoenas Beyond Its Jurisdiction*

The district court ruled that the Government did not have jurisdiction over a foreign nationals in another country and the court could not force them to come across the border to testify in the United States. [ER 169.] Moreover, the court determined that Sanchez-Lima had an opportunity to retain the aliens in the United States and choose not to do so. [ER 170.] Lastly, the district court ruled that if the aliens did wish to return to testify, the court would issue an order paroling them across the border and protecting them from prosecution by the Government. However, Federal Defenders would be responsible for the aliens travel expenses, not the Government. [ER 171-172.] Because the witnesses are foreign nationals located outside the United States, they are beyond the subpoena power of the district court. *See* 28 U.S.C. § 1783; *United States v. Drogoul*, 1 F.3d 1546, 1553 (11th Cir. 1993); *United States v. Farfan-Carreon*, 935 F.2d 678, 680 (5th Cir. 1991); *United States v. Sindona*, 636 F.2d 792, 803 (2d Cir. 1980). The *29 issue is not whether Sanchez-Lima is entitled to Rule 17(b) subpoenas, but rather whether the district court had the authority to issue said subpoenas. In this case, Sanchez-Lima requested that the district court issue Rule 17(b) for four witnesses who are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nationals of Mexico and who were residing in Mexico; it is quite clear that the
witnesses were outside of the court's jurisdiction. Such a subpoena would be in-
valid on its face.

### 4. *The District Court's Ruling Did Not Prevent Sanchez-Lima from Presenting a Defense*

As stated above, the witnesses' testimony was cumulative and Sanchez-Lima's re-
quest was untimely. Sanchez-Lima was given every opportunity to retain the wit-
nesses here in the United States. Because the witnesses demonstrated a willingness
to testify on behalf of Sanchez-Lima, the district court was prepared to issue an
order paroling the witnesses across the border and protecting them from prosecu-
tion. However, the court would not require the Government to pay for the expenses
because Sanchez-Lima was notified of the pending deportation and took no action to
prevent it. [ER 172.] Lastly, the Government and Sanchez-Lima entered into a stip-
ulation allowing the nine aliens1 Grand Jury testimony as evidence in the trial in
the defense's case in chief. [ER 176.] Thus, permitting Sanchez-Lima to present
testimony from the deported aliens; the district court exercised great latitude in
allowing Sanchez-Lima to present his defense. In short, the court did not abuse
its discretion.

**\*30** E. *THE DISTRICT COURT PROPERLY REFUSED TO ALLOW THE VIDEOTAPED STATEMENTS OF
THE WITNESSES IN MEXICO INTO EVIDENCE*

#### 1. *Introduction*

Sanchez-Lima argues that the district court should have admitted sworn videotaped
statements into evidence. The district court ruled that the sworn videotaped
statements of the four aliens in Mexico were inadmissible hearsay. [ER 172.]

#### 2. *Standard of JReview*

Whether the district court correctly construed the hearsay rule is a question of
law reviewed de novo. *United States v. Fowlie*, 24 F.3d 1059, 1068 (9th Cir. 1993).
Other aspects of the district court's exclusion of hearsay evidence are reviewed
for a abuse of discretion. *Id.*

#### 3. *The Proposed Hearsay Has No Guarantee of Trustworthiness*

Sanchez-Lima offers the hearsay under the "catch-all" exception to the hearsay
rule. *See* Fed. R. Evid. 804(b)(5). This exception, however, requires "guarantees
of trustworthiness." *Id.* Far from providing any "guarantees of trustworthiness,"
the proposed hearsay is less reliable than most. First, the declarants are not law
abiding persons. All four of the aliens violated the law's of the United States by
illegally entering the United States on or about May 22, 1996. *See* 8 U.S.C. §
1325. Two of the declarants, Silvino Cisneros-Sanchez and Cirilo Lima-Soriano, ad-
mitted that they agreed to pay the group's guide to smuggle them **\*31** into the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

United States through the rugged terrain of Otay Mountain. The other two declarants, Julio Sanchez-Herrera and Jose Soriano-Oropeza denied that the group even had a guide.

Moreover, the proposed declarants are not objective. To the contrary, all were arrested by the Border Patrol along with Sanchez-Lima. The declarants demonstrated their allegiance to Sanchez-Lima by the extraordinary measures they took to give these sworn statements. Specifically, to give these sworn statements, the declarants traveled by bus for several hours to Mexico City from their home towns, arrived at the United States Embassy "in the early morning hours" and "waited a significant amount of time" for the Embassy to open. [SER 71.] See Sanchez-Lima's Brief at 6. Quite obviously, the declarants did not endure these hardships to assist the Government in its prosecution of Sanchez-Lima. Indeed, two of the declarants, Julio Sanchez-Herrera and Cirilo Lima Soriano, admit in their sworn statements that they are from Sanchez-Lima's hometown, and are friends of Sanchez-Lima from childhood. Cf. United States v. Rhodes, 713 F.2d 463, 473 (9th Cir. 1983) (affirming district court's ruling that a statement "made to an attorney for the benefit of a co-conspirator" was unreliable).

Third, the statements themselves are inherently unreliable. For example, all four of the declarants claimed to believe that the uniformed Border Agents who approached their group–were, in fact, thieves. All of the aliens' statements in this regard are **32 inconsistent with the agent's testimony that the aliens not only knew who they were, but that several aliens came out of the bushes and self-surrendered to the agents. [ER 145.]

One of the declarants, Silvino Cisneros-Sanchez, made the incredible claim that he did not realize that Border Patrol Agents were in the area until *after* he was handcuffed and in custody. When testifying before the Grand Jury, however, Mr. Cisneros-Sanchez claimed no such ignorance and testified that "We were resting when *we heard that immigration arrived.*" [SER 21 (emphasis added).] United States v. Shaw, 812 F.2d 1182, 1188 n.2 (9th Cir. 1987) ("Rose's grand jury testimony that Shaw possessed the pistol would support a ruling that her contrary statements to defense and FBI investigators are not trustworthy and are therefore inadmissible.").

Finally, the Government had no opportunity to either cross-examine the declarants on their facially absurd claims, or object to the many leading, irrelevant and other impermissible questions posed to the declarants. See, e.g., United States v. Wagner, 834 F.2d 1474, 1479 (9th Cir. 1987) (refusing to allow hearsay "because they lacked sufficient clarity and trustworthiness to be put before the jury without the authors' live testimony and availability for cross examination"). While Sanchez-Lima contends that the Government was invited to participate in his circumvention of the court's rulings, there was no reason for the Government to participate in light of the court's two prior rulings denying **33 depositions and subsequent ruling in chambers that it would not allow this particular hearsay into

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)                                                    Page 22
(Cite as: 1997 WL 33547093)

evidence.

In conclusion, far from presenting "guarantees of trustworthiness," Sanchez-Lima's proposed hearsay comes from violators of the laws of the United States with obvious allegiance toward Sanchez-Lima, who made inherently incredible statements that were not subject to cross-examination. These statements fall within neither the "catch-all" nor any other exception to the rule against hearsay, and therefore, were correctly excluded from evidence.

### 4.  *The Declarants Are Not "Unavailable"*

In addition to "guarantees of trustworthiness," Sanchez-Lima also must demonstrate that "the declarant is unavailable as a witness" to admit the proposed hearsay. *See* Fed. R. Evid. 804(b). In moving the court for an order allowing depositions, the defense submitted declarations representing that each of the declarants "expressed his unwillingness to come to the United States to testify in Sanchez-Lima's trial even if a motion for payment of his travel and subsistence expenses were granted." [ER 112.]

When asked in the videotape sworn statements whether they were willing to travel to the United States to testify at trial, however, none of the declarants refused this request. To the contrary, three of the four aliens stated that they would be willing to testify at Sanchez-Lima's trial. [ER 158.] The fourth declarant, Jose Soriano-Oropeza, was not asked if he was willing to **\*34** testify at the trial. The aliens' willingness to testify coupled with the court's order paroling them across the border and protecting them from prosecution clearly demonstrates that the aliens were available.

In light of these responses, Sanchez-Lima has not made an adequate showing that the declarants were unavailable as witnesses. According, the court appropriately denied Sanchez-Lima's request.

### 5.  *The Refusal To Admit Unreliable Hearsay Does Not Violate the Sixth*

As a last grasp, Sanchez-Lima claims that the exclusion of this unreliable hearsay somehow would violate his Sixth Amendment rights. The Ninth Circuit applies a five-part test to determine whether "exclusion of evidence reaches constitutional proportions." *See Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990). One of those factors is the "reliability" of the excluded evidence. *Id.* Thus, the exclusion of unreliable hearsay--the very evidence offered here-- did not violate Sanchez-Lima's constitutional rights. *Id.*

Moreover, the proposed evidence (*e.g.* hearsay that the Border Patrol Agents did not identify themselves and that Sanchez-Lima screamed) are matters to which Sanchez-Lima himself could have testified. In this situation, there are no constitutional violations. *See United States v. Duran*, 41 F.3d 540, 545 (9th Cir. 1994) ("In this case we need not apply the five-part test because [defendant] herself

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

could have testified on the issue . . . **35** [defendant] . . . cannot use hearsay evidence as a substitute for her own testimony.").

### F. THE DISTRICT COURT'S ADMISSION OF AGENT LOVEN'S OPINION THAT AGENT KERMES WAS TELLING THE TRUTH DOES NOT CONSTITUTE REVERSIBLE ERROR

#### 1. Introduction

Sanchez-Lima contends that the district court committed reversible error, when it allowed Agent Loven's opinion testimony into evidence. In his case-in-chief, Sanchez-Lima called Agent Loven to testify regarding inconsistencies in a post-incident interview with Agent Kermes. [RT 433-437; SER 184-188.]

After this disparaging direct examination, the Government's cross-examination consisted of the following:
BY AUSA BUTCHER:
Q AGENT, AM I CORRECT THAT AS PART OF YOUR TRAINING AS AN AGENT, YOU RECEIVED TRAINING ON WHETHER AND HOW TO DETECT WHETHER A WITNESS OR A PERSON YOU ARE INTERVIEWING IS LYING: .
A THAT'S CORRECT.
Q AND AMONG THE THINGS YOU WERE TAUGHT TO LOOK FOR INCLUDES WHETHER THE WITNESS IS LOOKING AWAY FROM YOU?
A AMONG OTHER GESTURES.
Q WOULD ANOTHER GESTURE BE BODY MOTIONS?
A THAT'S CORRECT.
Q AND AM I ALSO CORRECT THAT YOU WERE SHOWN A VIDEO OF PEOPLE WHO ACTUALLY ARE LYING AS PART OF YOUR TRAINING?
A THAT'S CORRECT.
Q NOW --
**36** MR. HUBACHEK: OBJECTION, YOUR HONOR. THIS IS VOUCHING FOR THE WITNESS. I ANTICIPATE THAT'S WHERE IT'S GOING.
THE COURT: THE OBJECTION IS OVERRULED.
BY MR. BUTCHER:
Q AND YOU HAVE INTERVIEWED, I TAKE IT, SEVERAL SUBJECTS IN THE COURSE OF YOUR CAREER AS AN FBI AGENT?
A YES, I HAVE.
Q AND DID YOU HAVE THE OPPORTUNITY TO OBSERVE PEOPLE WHO YOU THOUGHT WERE LYING TO YOU?
A YES.
Q WOULD YOU SAY THAT YOU HAVE SOME EXPERTISE IN DETERMINING IF ANYONE WAS LYING TO YOU?
MR. HUBACHEK: OBJECTION, YOUR HONOR. THERE'S NOBODY WHO'S AN EXPERT ON WHO'S TELLING THE TRUTH AND WHO'S NOT.
THE COURT: WELL, I THINK PROBABLY THIS IS BEYOND THE REALM OF EXPERTISE, BUT YOU MAY INQUIRE --
BY MR. BUTCHER:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Q WHAT I'D LIKE TO ASK YOU, AGENT, IS --
THE COURT: -- BUT DON'T INQUIRE IN TERMS OF EXPERTISE, IF YOU WOULD, PLEASE.
BY MR. BUTCHER:
Q. DID YOU OBSERVE ANY GESTURES, MANNERISMS, VOICE INFLECTIONS, ET CETERA ON THE
PART OF AGENT KERMES WHEN YOU WERE INTERVIEWING HIM THAT WOULD SUGGEST TO YOU THAT
HE WAS LYING TO YOU IN ANY WAY.
MR. HUBACHEK: I WOULD AGAIN OBJECT ON THE SAME BASIS.
THE COURT: THE OBJECTION IS OVERRULED.
THE WITNESS: IN MY OPINION, IT WAS A STRAIGHTFORWARD INTERVIEW WITH MR. KERMES. I
HAD NO IMPRESSIONS THAT HE WAS DECEIVING ME.
*37 MR'. HUBACHEK: OBJECTION. MOVE TO STRIKE. I ALSO NOTE THAT THAT WAS A NONRE-
SPONSIVE ANSWER.
THE COURT: THE OBJECTION IS OVERRULED, AND THE MOTION IS DENIED.
BY MR. BUTCHER:
Q YOU HAVE NO REASON TO BELIEVE HE WAS LYING TO YOU?
A NO.
MR. BUTCHER: NO FURTHER -- FURTHER QUESTIONS, YOUR HONOR.

[ER 350-352.]

Although it is unclear whether Agent Loven's testimony is expert or lay opinion,
the admission of his testimony into evidence was merely harmless error.

### 2. *Standard of Review*

The admission of lay opinion is reviewed deferentially for an abuse of discretion.
*United States v. Henderson*, 68 F.3d 323, 325 (9th Cir. 1995); *United States v. Von
Willie*, 59 F.3d 922, 929 (9th Cir. 1995).

### 3. *The Admission of Agent Loven's Testimony Was Proper*

Sanchez-Lima asserts that on cross-examination, the prosecution elicited testimony
that Agent Loven received training on detecting deceit and bases on that informa-
tion offered his observation that Agent Kermes did not exhibit any of the indicat-
ors of deceit. Sanchez-Lima also argues that the effect of Agent Loven's testimony
was to bolster the credibility of Agent Kermes. *38 This cross-examination was in
direct response to the direct examination casting doubt on Agent Kermes' veracity.

"[W]hen the defendant 'opens the door' to testimony about an issue by raising it
for the first time himself, he cannot complain about the subsequent government in-
quiry into the issue. *United States v. Rivera*, 43 F.3d 1291 (9th Cir. 1995). *See
United States v. Hegwood*, 977 F.2d 492, 496 (9th Cir. 1992). It is permissible,
however, to bolster the testimony of a witness whose credibility has been attacked
in an opening statement. *United States v. Santiago*, 46 F.3d 885, 891 (9th Cir.
1995). *See United States v. Meling*, 47 F.3d 1546 (9th Cir. 1995) (lay opinion that
defendant was feigning grief was properly admitted); *United States v. Rivera*, 43
F.3d 1291 (9th Cir. 1995) (no plain error in eliciting re-direct testimony from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 33547093 (C.A.9)
(Cite as: 1997 WL 33547093)

medical expert that sexual assault victim did not "fool" her); *see also United States v. Croft*, No. 95-30387 (9th Cir. Sept. 5, 1997) (prosecutor may bolster testimony of witness whose credibility has been attacked, by calling the FBI agent to testify that he had verified witness1 story).

### 4. *The Admission of Agent Loven's Testimony Was Harmless Error*

The admission of this testimony clearly qualifies as harmless error. First, in this case, Agent Kermes1 credibility was directly attacked on cross-examination and indirectly via Agent Loven's testimony. As a result, Sanchez-Lima opened the door to rehabilitation through bolstering evidence. The Government was **\*39** entitled to rehabilitate the credibility of a witness. More importantly, Agent Kermes took the stand and was questioned regarding the evening's events. [RT 206; SER 95.] He was subject to a cross-examination which specifically addressed inconsistences in his report and post-incident interview. [RT 239-279; SER 94-136.] Throughout this period, the jury members had opportunity to personally obser.ve Agent Kermes and independently assess the agent's credibility in light of their own experience. Agent Loven's opinion thus becomes irrelevant because the jury had the chance to observe the witness first hand. Lastly, the jury deadlocked on Count 2 of the Indictment concerning the attack on Agent Kermes. Conversely, the jury obviously believed the Government's version of the facts and determined that Agent Salzano was the victim of an unprovoked, vicious attack. Because of the deadlock on the assault on Agent Kermes, it is irrelevant that Agent Loven's opinion was admitted into evidence. The issue is moot and thus, is clearly harmless error.

### G. *JUDGE SCHWARTZ DID NOT ERR IN DENYING THE MOTION FOR A NEW TRIAL BECAUSE JUDGE BREWSTER SHOULD HAVE RECUSED HIMSELF*

#### 1. *Introduction*

Sanchez-Lima's motion to recuse Judge Brewster came *after* an adverse verdict in a jury trial. Before the verdict, however, Judge Brewster had presided over this case for over five months, resolving four sets of motions, with absolutely no objection by the defense. The ground alleged for this belated claim was that the **\*40** Assistant U.S. Attorney who prosecuted this case worked as a law clerk for Judge Brewster over six years ago. Now that Sanchez-Lima is aggrieved by adverse pretrial rulings and an adverse jury verdict, Sanchez-Lima seeks to relitigate this case before another judge and jury. There was no basis for Judge Brewster to recuse himself.

#### 2. *Standard of Review*

The denial of a motion to recuse is reviewed for abuse of discretion. *United States v. Hernandez*, 109 F.3d 1450, 1453, (9th Cir. 1996) (citing *United States v. Sibla*, 624 F.2d 864, 868 (9th Cir. 1980)). If a party fails to bring specific facts allegedly presenting grounds for recusal to the attention of the district court, the party will bear a greater burden on appeal. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   3. *Sanchez-Lima Has Not Filed the Affidavit Necessary To Support Recusal Under 28
                                U.S.C. § 144*

Sanchez-Lima seeks Judge Brewster's recusal, in part, under 28 U.S.C. § 144. That
section provides:
Whenever a party to any proceeding makes and files a timely and sufficient affi-
davit that the judge before whom the matter is pending has a personal bias or pre-
judice either against him or in favor of any adverse party, such judge shall pro-
ceed no further therein, but another judge shall be assigned to hear such proceed-
ing.
The affidavit shall state the facts and the reasons for the belief that bias or
prejudice exists . . . .

Sanchez-Lima's affidavit does not satisfy the requirements of this statute. Com-
pletely lacking from the affidavits are any allegation that Judge Brewster had any
personal bias or prejudice **41** either against Sanchez-Lima or in favor of the Gov-
ernment. *See* Exhibit E to defendant's motion. [ER 411-414.] Similarly lacking are
any facts or reasons for that proposition. The district court properly denied the
request for a new trial under 28 U.S.C. § 144.

      4. *There Was No Ground for Judge Brewster to Recuse Himself*

Sanchez-Lima also has failed to justify Judge Brewster's recusal under 28 U.S; C.
§ 455. One of the requirements of this section is the recusal of a judge "in any
proceeding in which his impartiality might reasonably be questioned." *Id.* Cases
where a judge's former law clerk represents one of the parties are not such pro-
ceedings.

Numerous cases, applying this statute, have held that there is no reason for a
judge to recuse himself from cases in which a party is represented by a former law
clerk. In *United States v. Bosch*, 951 F.2d 1546, 1548-49 (9th Cir. 1991), the
Ninth Circuit found no plain error where the district court judge presided over a
trial involving a former law clerk, where, unlike here, the judge and former law
clerk had maintained a close personal relationship. Indeed, because, as discussed
below, there is no close personal relationship between Judge Brewster and Assist-
ant U.S. Attorney (AUSA) Butcher, even the dissent in *Bosch* would not find any
reason for Judge Brewster to recuse himself from the instant case:
Nor do I mean to suggest that a federal judge may never preside over proceedings
involving a former law clerk. *The issue . . . is not that [the AUSA] was a former
law clerk but rather that he was regarded bv the Judge, based* **42** *on the judge's
own statements in the record, as an especially dear friend and as one of the
judge's own sons.*

*Id.* at 1556, n.7 (O1Scannlain, J. dissenting) (emphasis added); *see also id.* at
1556 (district judge should have recused "[i]n light of the judge's strong affec-
tion for the prosecutor, as expressed by his comments during the proceedings").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Other circuits agree that there is no basis for a federal judge to recuse himself from cases where one of the attorneys is a former law clerk. *See, e.g., United States v. Hollister*, 746 F.2d 420, 425 (8th Cir. 1984) (district court did not err in refusing to recuse himself from case where prosecutor "had finished her clerkship just three months before becoming involved in the prosecution of [defendant]"); *Smith v. Pepsico, Inc.*, 434 F. Supp. 524, 525 (D.C. Fla. 1977).

While not required under any case law, Judge Brewster has a standing policy of recusing himself for *two years* from cases in which a party is represented by a former law clerk. *Accord Hollister*, 746 F.2d at 425 ("We . . . endorse the principle that a certain insulation period should pass before a judge sits on a case in which his or her former law clerk acts as counsel."). Assistant U.S. Attorney Butcher clerked for Judge Brewster over six years (and 14 law clerks) ago. [SER 191.] The relationship during that one year clerkship was strictly professional, [*Id.* at par. 7.]

**\*43** In the six years subsequent to that clerkship, AUSA Butcher has had only limited contact with Judge Brewster consisting of lunch on approximately five occasions (usually with other former law clerks) and attending a banquet celebrating the tenth anniversary of Judge Brewster's appointment to the bench. [*Id.* at 2, par. 6.] Since joining the United States Attorney's Office in November 1995, AUSA Butcher has had absolutely no extra-judicial contact with Judge Brewster. [*Id.* at par. 7.]

While Sanchez-Lima seeks to personalize the litigation by suggesting that Judge Brewster was called upon to' determine whether AUSA Butcher acted in bad faith, that is not the standard that governed Defendant's Motion to Dismiss. The correct standard for resolution of Sanchez-Lima's motion was whether the Government—the party represented by AUSA Butcher—acted in bad faith in granting the aliens' request for a voluntary return to Mexico rather than incarcerating them as material witnesses. *See United States v. Dring*, 930 F.2d 687, 693 (9th Cir. 1991) ("the defendant must make an initial showing that the Government acted in bad faith and that this conduct resulted in prejudice to defendant's case."). In determining whether the Government acted in bad faith, Judge Brewster was required to determine whether, for example, the Immigration and Naturalization Service departed from normal deportation procedures and whether the Government did so to gain a strategic advantage over Sanchez-Lima. *See id.* at 694-95 (motion to dismiss Indictment properly denied because defendant "made no **\*44** showing that the Government departed from normal deportation procedures [and] made no showing that the Government deported the aliens to gain an unfair tactical advantage over him at trial").

Indeed, unlike Sanchez-Lima's present effort to bolster his recusal motion by leveling personal attacks against AUSA Butcher, Sanchez-Lima did not even allege any bad faith on the part of AUSA Butcher in the original motion that Judge Brewster was asked to resolve. Rather, Sanchez-Lima articulated the correct legal standard that "'[t]he first step requires that the Executive Branch of the government de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

termine that the witnesses sought to be deported do not possess evidence favorable or material to Sanchez-Lima," and proceeded to contend that "the government cannot satisfy the first prong . . . in this case, since no determination was made as to whether any of the witnesses who were released possessed evidence favorable to the defense." [SER 4-5.]

Contrary to those allegations, the record demonstrated that the Government notified the defense of the location of the aliens and of their impeding deportation, that the defense interviewed each of the aliens prior to their deportation and made no request to detain any of the aliens as material witnesses. In sum, Judge Brewster denied the motion because it had absolutely no merit, not because he was biased in favor the Government.

**\*45** V

CONCLUSION

For the foregoing reasons, Sanchez-Lima's conviction should be affirmed.

STATEMENT OF RELATED CASES

Government counsel is not aware of any cases before this Court related to this appeal.

UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Gabriel SANCHEZ-LIMA, Defendant-Appellant.
1997 WL 33547093 (C.A.9)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.